IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ANTHONY WESTBROOK                              PLAINTIFF

VS.            CASE NO.: 4:13-CV-0415 JMM

DEPUTY CALVIN REED;
SHERIFF BRUCE PENNINGTON;
JOHN and JANE DOES I-V; and
COUNTY OF SALINE                             DEFENDANTS

ORAL DEPOSITION

OF

CALVIN T. REED

(Taken February 18, 2014, at 3:05 p.m.)

LEE ANN DICKENS, CCR
7315 I STREET
LITTLE ROCK, ARKANSAS 72207
(501) 614-7367

EXHIBIT D

# APPEARANCES

ON BEHALF OF THE PLAINTIFF:

MR. JAMES F. SWINDOLL
LAW OFFICES OF JAMES F. SWINDOLL
212 CENTER STREET
SUITE 300
LITTLE ROCK, ARKANSAS    72201


ON BEHALF OF THE DEFENDANTS:

MR. GEORGE D. ELLIS
ELLIS LAW FIRM
126 NORTH MAIN STREET
BENTON, ARKANSAS    72018

3

# I N D E X

STYLE AND NUMBER. . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 3

THE WITNESS:   **CALVIN T. REED**

    EXAMINATION BY MR. SWINDOLL . . . . . . . . . . . 5

    EXAMINATION BY MR. ELLIS. . . . . . . . . . . . . 28

    FURTHER EXAMINATION BY MR. SWINDOLL . . . . . . 31

    FURTHER EXAMINATION BY MR. ELLIS. . . . . . . . 32

DEPOSITION CONCLUDED. . . . . . . . . . . . . . . . . 33

COURT REPORTER'S CERTIFICATE. . . . . . . . . . . . . 34

# E X H I B I T S

NO./DESCRIPTION:                                MARKED:

Exhibit No. A - Photograph. . . . . . . . . . . . . . 20

Exhibit No. B - Photograph. . . . . . . . . . . . . . 20

```
 1                       C A P T I O N
 2        ANSWERS AND ORAL DEPOSITION OF CALVIN T. REED,
 3   taken in the above-styled and numbered cause on the
 4   18th day of February, 2014, on behalf of the
 5   PLAINTIFF, before Lee Ann Dickens, Arkansas Supreme
 6   Court Certified Court Reporter #403, a Notary Public
 7   in and for Pulaski County, Arkansas, at 3:05 p.m., at
 8   the Law Offices of James F. Swindoll, 212 Center
 9   Street, Suite 300, Little Rock, Arkansas, pursuant to
10   the Federal Rules of Civil Procedure.
11
12                  * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LEE ANN DICKENS, CCR
(501) 614-7367

5

```
 1                   P R O C E E D I N G S
 2              THEREUPON,
 3                    CALVIN T. REED,
 4          THE WITNESS HEREINBEFORE NAMED,
 5          having been first duly cautioned and
 6          sworn by me to testify to the truth,
 7          the whole truth, and nothing but the
 8          truth, testified on his oath as follows,
 9          to-wit:
10                      EXAMINATION
11    BY MR. SWINDOLL:
12    Q    Could you give us your full name, please.
13    A    Calvin Taylor Reed.
14    Q    And how long have you been working in law
15    enforcement, Calvin?
16    A    About 5 years.  3 years at the county jail.  2
17    years at Alexander Police Department.  I just
18    recently started back at the sheriff's department as
19    a patrol deputy.
20    Q    Here in Saline County?
21    A    Yes, sir.
22    Q    Who was your supervisor in May of 2011?
23    A    Sergeant Mike Richards.
24    Q    And was that your immediate supervisor?
25    A    No, sir.  My immediate supervisor was Corporal
```

13

1  A   He told me I think you need to go out here.
2  McCloud needs help with this guy.
3  Q   Did he tell you anything else?
4  A   No, sir.
5  Q   When you went out, what did you see?
6  A   That Mr. Westbrook was coming out of the
7  restroom where all the detainees or inmates are taken
8  when they are being changed into their jail uniforms.
9  And McCloud or Deputy McCloud was coming out with
10 crumpled papers that were wet.
11 Q   And do you know what those papers were?
12 A   It was the ADR.
13 Q   Was it also the bonding papers of Anthony
14 Westbrook?
15 A   No, sir.
16 Q   You're saying those bonding papers were not in
17 his possession at the same time?
18 A   No, sir.
19 Q   Did you see the ADR?
20 A   Yes, sir.  I did.
21 Q   Did you make a copy of it?
22 A   No, sir.  I didn't.
23 Q   But at the time you saw it, there were not any
24 other documents for Mr. Westbrook?
25 A   No, sir.

1  Q    What did you do when you saw the deputy come out
2  of the bathroom with papers wet?  What was your
3  action?
4  A    I had asked Mr. Westbrook what was he doing with
5  those papers.
6  Q    And what did he tell you?
7  A    The bald-headed man told me to get them, which
8  at the time Deputy McCloud was the only jailor that
9  we had that was bald.
10 Q    What did you do next?
11 A    We escorted him to our restraint chair, told him
12 that he was going to sit there for a while and after
13 he calmed down he could finish bonding out and he'd
14 be free to go.
15 Q    And you put him in the restraint chair?
16 A    I assisted him down to the chair.
17 Q    And you restrained him?
18 A    Yes, sir.
19 Q    What happened next?
20 A    I showed him the ADR and told him that he could
21 not have those papers, those -- after the police
22 officers and after the jailors had to use that
23 information to put in to the computer to show that he
24 had been booked in to our jail; that those were now
25 court documents and that he couldn't have those.  In

1 order for him to get copies of them, you have to have
2 an attorney to go through the procedures of getting
3 copies of that paperwork.
4 Q   And that's what you told him?
5 A   Yes, sir.
6 Q   What did you do next after you told him that?
7 A   He continued to argue several times that either
8 the bald-headed man told him to get it or his words
9 were "that girl" -- the female jailor that was
10 processing his paperwork that one of them told him to
11 get those papers.
12 Q   So what did you do?
13 A   I continued to tell him no.  You cannot have
14 these papers.  These are not yours.
15 Q   And he's restrained at this time?
16 A   Yes, sir.
17 Q   He can't argue back.  He can't resist arrest?
18 A   No.
19 Q   And he's not constituting any danger to your
20 person.  Do you agree?
21 A   Yes.
22 Q   What did you do next?
23 A   At that time, he went to yell at me. I'm not
24 sure -- I can't remember what he said, but he did
25 make a lunging motion.

16

1  Q   In the chair?
2  A   Yes, sir.
3  Q   And what did you do?
4  A   I put my hands up, placed them on his chest to
5  push him back down into the chair. And at that time,
6  his -- is when the chair slid against -- slid over
7  the floor and hit the wall.
8  Q   And what happened to Tony when it hit the wall?
9  A   As far as I know, nothing happened to him. He
10 started screaming, but nothing physically happened to
11 him.
12 Q   I'm going to show you a picture which is off the
13 TV tape.
14 A   Uh-huh.
15 Q   And that is apparently you talking or dealing
16 with Mr. Westbrook.
17 A   Yes, sir.
18 Q   What are you doing when that's happening right
19 there?
20 A   I mean, right there it's kind of hard to tell.
21 I mean, I know I was still talking to him. But --
22 Q   Do you put your hands on Mr. Westbrook?
23 A   On his -- right here on his chest.
24 Q   And as a result of that touch, does his chair
25 end up against the wall?

LEE ANN DICKENS, CCR
(501) 614-7367

```
 1              MR. ELLIS:  I know the answer to that
 2         question, by the way.  I'll tell you later.
 3    Q    (By Mr. Swindoll)  So as we sit here today, you
 4    cannot figure out why Anthony Westbrook thinks you
 5    hits him?
 6    A    No, sir.  In fact, I did not know anything about
 7    that until I guess it was the second time being on
 8    the news.  And he told every -- told them that I
 9    knocked his teeth out.  That was the first time I
10    heard about any teeth being knocked out at all.
11    Nobody else said anything about it.
12         The night of this I never did watch the film.
13    Some of the other jailors told me that they had seen
14    it whenever they were in the sergeant's office and
15    none of them said I ever hit him or knocked any teeth
16    out or anything.
17    Q    Do you know what happened to this film?
18    A    I -- no, sir.  As far as I know, the system is
19    in one of the closets in the back that records
20    everything.  And the sergeants are the ones that
21    download all the footage.  And whatever they do with
22    it, I have no idea.  I don't even know how that's set
23    up.
24    Q    How long was Anthony Westbrook in the restraint
25    chair?
```

LEE ANN DICKENS, CCR
(501) 614-7367

1  A    I am not sure.
2  Q    How long is acceptable at the Saline County jail
3  to keep an inmate in the restraint chair?
4  A    I would probably say 45 minutes.  But if they're
5  not being cooperative, then we do leave them in there
6  for additional time until they can calm down and
7  start to cooperate with the jailors.
8  Q    Should they be kept in that chair and not
9  allowed to go to the bathroom?
10 A    No, sir.
11 Q    If they ask to go to the bathroom while they're
12 in the chair, should they remove the chair and
13 allowed to go to the bathroom?
14 A    Yes, sir.
15 Q    At the time his chair bounced into the wall --
16 A    Uh-huh.
17 Q    -- he was restrained.  Do you agree?
18 A    Yes, sir.
19 Q    Now, the restraints are arm restraints?
20 A    It has straps that go over the wrist, a strap
21 that goes across the lap, a strap for each ankle.
22 And then it has a strap that comes down under or over
23 the shoulder, comes under the arm and hooks on to
24 a -- and it hooks on to two small hooks that are
25 about midway of the chair.

1  Q    Okay.
2       And he was restrained.  He was -- you restrained
3  him.  You put him in the chair?
4  A    Yes, sir.
5  Q    So you used all the restraints?
6  A    Yes, sir.
7  Q    So how is it that if he's restrained in the
8  chair he can surge towards you, sir?
9  A    Those straps at the time -- that chair has -- it
10 had been there for a while and we had put so many
11 people in that chair that they have managed to pry
12 those straps up just enough to get their arms out.
13 So the straps had been worn, so it is -- it was
14 fairly easy to get a good surge and loosen those
15 straps.
16 Q    Were you responsible for making sure that Tony
17 Westbrook was in the chair?
18 A    I was not responsible.  But since I did come out
19 to assist Deputy McCloud then I went ahead and placed
20 him in the chair and put the straps on him to
21 restrain him down.
22 Q    And why did you do that?
23 A    Because he -- the yellow line that borders the
24 counter, we have signs posted that tell the inmates
25 or detainees not to step across that line unless told

1  to.  When he stepped across that line and he reached
2  across that counter, then I perceived that as a
3  threat on to Deputy Drennan's life.  So we put him in
4  the chair to restrain him down because we did not
5  know what his intentions were when he reached across
6  that counter.  There's several items there that could
7  possibly be used as weapons.
8           MR. ELLIS:  I'm so sorry.  I thought I
9      had turned that off.
10 Q  (By Mr. Swindoll)  So, Mr. Reed, I want to be
11 sure I understand.  You believe that the chair was
12 necessary because Tony represented a danger to the
13 life of the jailors around him.  Is that what you're
14 telling me?
15 A  Yes, sir.
16 Q  And as a result of your perception of that
17 danger, you placed him in the chair?
18 A  Yes, sir.
19 Q  And you left him there for 4 hours?
20 A  I'm not sure what the time limit was.
21 Q  Why did you leave him for so long?
22           MR. ELLIS:  What a minute.  He said he
23      didn't know how long.
24           MR. SWINDOLL:  I'm not saying that.  I'm
25      saying how long -- why did you leave him

1   there so long however long you left him.
2           MR. ELLIS:  I'm going to object to the
3   form of the question because his answer --
4   your question contradicts his answer.
5           Go ahead and answer if you can.
6   A   After he was put in the chair and we took him to
7   the multi-purpose room or what we normally call the
8   courtroom, I went back to my assigned area which was
9   the ACIC computer in the control room.
10  Q   (By Mr. Swindoll)  You were punishing him,
11  weren't you?
12  A   No, sir.
13  Q   You were punishing him for putting him in the
14  chair?
15  A   No, sir.
16  Q   What were you doing if you weren't punishing
17  him?
18  A   His acts was a disruption to what was going on
19  in the booking area so we put him in the chair and
20  removed him from the booking area and put him in the
21  multi-purpose room so that the normal procedures of
22  booking could continue.
23  Q   Who let him out?
24  A   Myself and Deputy McGuire.
25  Q   Why?

28

```
 1                      EXAMINATION
 2   BY MR. ELLIS:
 3   Q    When he crossed that yellow line and when he was
 4   engaged in other conduct, was he disruptive?
 5   A    He was not disruptive when he stepped across the
 6   line.  But when he stepped across, he reached over,
 7   grabbed the ADR paperwork.  He then turned away from
 8   the female jailor, started to roll the papers up and
 9   stick them in his pocket that was away from her so
10   she could not see him.
11   Q    When -- immediately prior to you putting him in
12   the restraint chair, had he become disruptive --
13   A    Yes.
14   Q    -- in terms of his body language, his demeanor,
15   his tone of voice?  Any of that?
16   A    Yes.
17   Q    Okay.
18   A    When he ran into the bathroom and Deputy McCloud
19   followed him in there, he came out yelling and
20   screaming that that girl told him to, the bald-headed
21   man told me to.  And at that time, he was being
22   disruptive.
23   Q    And can you run the booking area of a jail under
24   those --
25   A    No.
```

29

1  Q    -- circumstances?
2  A    No, sir. You can't.
3  Q    The female who was booking, what was her name?
4  A    Crystal Drennan.
5  Q    How long had she been on the job about?
6  A    Maybe 2 to 3 months.
7  Q    And who trained her?
8  A    Myself. At the time when she joined it was
9  Corporal Mayor.
10 Q    Okay.
11 A    But he had got reassigned to another position at
12 the sheriff's office.
13 Q    So it was pretty much you?
14 A    Yes, sir.
15 Q    Was she a good employee?
16 A    Yes, sir.
17 Q    Did she know what she was supposed to do?
18 A    Yes, sir.
19 Q    Now, finally, there are two -- we've got
20 photographs -- and I think that those are already in
21 evidence over there -- of a gray -- we've got a gray
22 restraint chair and a black restraint chair.
23 A    Yes, sir.
24 Q    First of all, there's some cuffs on the gray
25 chair. What are those cuffs for?

1   A   Those were added after the wrist straps and
2   ankle straps had been I guess you'd say loosened
3   after putting several people in there who actually
4   made attempts and some were successful at loosening
5   those straps to get out of the chair.
6   Q   And you didn't know or did you -- let me
7   rephrase.
8       Did you know whether Mr. Westbrook would be able
9   to accomplish that when you put him in the chair?
10  A   No, sir.  I didn't.
11  Q   And as he lunged at you, did you know whether he
12  could come out of those straps or not?
13  A   No, sir.
14  Q   Now, I also notice in the background -- and I
15  think it's in that photograph over there that's
16  already in evidence -- a black chair.  Now, was Mr.
17  Westbrook in the gray chair or the black chair?
18  A   He was in the gray chair.
19  Q   How do you know that?
20  A   The black chair was not at the jail at that
21  time.  That chair has just been added in the past 2
22  years.
23  Q   Okay.
24      So it had not even been purchased?
25  A   No, sir.

```
 1   Q    It had to be the gray chair?
 2   A    Yes, sir.
              MR. ELLIS:  That's all I had.
 4                  FURTHER EXAMINATION
 5   BY MR. SWINDOLL:
 6   Q    Just a couple of follow-ups.  Calvin, you did
 7   not see Tony cross the yellow line, did you?
 8   A    No, sir.
 9   Q    You heard about it?
10   A    Heard about it.
11   Q    By the time you heard about it and you went
12   there, Tony was coming out of the bathroom; is that
13   right?
14   A    Yes, sir.
15   Q    So you didn't see anything until you had
16   confronted Tony in the courtroom is what that's
17   called?
18   A    He -- he was back out into the -- just in the
19   booking area --
20   Q    Okay.
21   A    -- at the time when I confronted him.
22   Q    And that's the first time.  You don't know what
23   had been said in the bathroom?
24   A    No, sir.
25   Q    And he told you that someone had told him to do
```

```
 1   that?
 2   A    Yes, sir.
 3              MR. SWINDOLL:  No more.
 4                     FURTHER EXAMINATION
 5   BY MR. ELLIS:
 6   Q    Did you see -- during any of this, as he came
 7   out of the -- beginning when he came out of the
 8   bathroom and then after he was rolled up to what they
 9   call the courtroom --
10   A    Uh-huh.
11   Q    -- was his bail bondsman present that you saw?
12   A    Yes.  She was in the -- what we call the bonding
13   room where the bonding agent --
14   Q    Uh-huh.
15   A    -- is in one room.  There is a wall with a glass
16   window for them to talk back and forth.  And then the
17   inmate or detainee sits in the other room while they
18   pass the paperwork back and forth to do their bonding
19   process.
20   Q    How his mother?  Did you see Mr. Westbrook's
21   mother?
22   A    Yes.  She was in the room with R. J. Walker.
23   Q    Okay.
24              MR. ELLIS:  All right.  Thank you.
25              MR. SWINDOLL:  All right.
```